## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| ALYSON SLAUGHTER, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>NATIONAL RAILROAD PASSENGER CORPORATION, d/b/a AMTRAK,<br><br>    Defendant. | CASE NO. _____<br><br>**JURY TRIAL DEMAND** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Alyson Slaughter, individually and on behalf of all others similarly situated, seeks a permanent injunction requiring a change in the corporate policies of Defendant National Railroad Passenger Corporation, d/b/a Amtrak ("Amtrak") to cause Amtrak's mobile websites and mobile application to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff alleges, upon personal knowledge as to Plaintiff's individual actions and upon information and belief and/or counsel's investigations as to all other matters, the following:

## INTRODUCTION

1.  In March of 2015, the Department of Transportation ("DOT") revised its rules to specifically provide that "that transportation entities are required to make reasonable modifications/accommodations to policies, practices, and procedures to avoid discrimination and ensure that their programs are accessible to individuals with disabilities." *See* https://www.federalregister.gov/documents/2015/03/13/2015-05646/transportation-for-individuals-with-disabilities-reasonable-modification-of-policies-and-practices.  The rule became final in July of 2015 and was "needed to clarify that public transportation entities are required to

make reasonable modifications/accommodations to their policies, practices, and procedures to ensure program accessibility." *Id.*

2.      DOT further indicated:

"While this requirement is ***not*** a new obligation for public transportation entities receiving Federal financial assistance (see section 504 of the Rehabilitation Act), including the National Passenger Railroad Corporation (Amtrak), courts have identified an unintended gap in our Americans with Disabilities Act (ADA) regulations. This final rule will fill in the gap. The real-world effect will be that the nature of an individual's disability cannot preclude a public transportation entity from providing full access to the entity's service unless some exception applies."

*Id.* (emphasis added).

3.      More recently, the United States Court of Appeals for the Ninth Circuit confirmed the ADA applies to websites and mobile applications, equally. *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019).

4.      Plaintiff is an individual with a disability as defined by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 C.F.R. §§ 37 *et seq.*, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C.A. § 705, and its implementing regulations set forth at 9 U.S.C. §§ 794 *et seq.*

5.      Plaintiff uses the terms "blind" or "visually-impaired" to refer to all people with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200.

6.      Plaintiff Slaughter requires Dynamic Type to read content on websites and apps using her iPhone 7. "Dynamic Type [ ] allows users to choose the size of textual content displayed on the screen. It helps users who need larger text for better readability." *See* Apple, Scaling Fonts Automatically, *available at* https://developer.apple.com/documentation/uikit/uifont/scaling_fonts_automatically (last

accessed September 24, 2019).

7.      "Since 1971, Amtrak® has been America's provider for intercity passenger rail services. With more than 500 destinations, in 46 states and Canada, Amtrak connects lives all over North America." *See* Facebook About Page, Amtrak, *available at* https://www.facebook.com/pg/Amtrak/about/?ref=page_internal (last accessed September 24, 2019).

8.      Consumers like Plaintiff are unable to fully access Amtrak's Websites and Apps' goods, content, services, and Amtrak's physical locations due to the inaccessibility of: (a) Amtrak's mobile website, https://m.amtrak.com; (b) its purportedly (but not) accessible version of the mobile website; and (c) its mobile applications that Amtrak makes available for iOS[1] devices (collectively, "Websites and Apps"), which Websites and Apps Amtrak owns, operates, and controls.

9.      Amtrak is responsible for the policies, practices, and procedures concerning the development and maintenance of the Websites and Apps.

10.     Unfortunately, Amtrak denies approximately 8.1 million Americans,[2] including more than 250,000 residents of Illinois,[3] access to its Websites & Apps goods, content, and services because (a) when Dynamic Font Text is enabled, the App's content becomes truncated and users

---

[1]      Consumers may download Amtrak's iOS mobile application at https://apps.apple.com /us/app/amtrak/id405074003 (last accessed September 24, 2019).

[2]      *See* Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/ newsroom/releases/archives/miscellaneous /cb12-134.html (last accessed September 24, 2019) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

[3]      *See* American Foundation for the Blind, State-Specific Statistical Information: Illinois, *available at* https://www.afb.org/research-and-initiatives/statistics/state-specific-stats/ illinois#2016 (last accessed September 24, 2019).

are unable to scroll vertically or horizontally to access the content; (b) when Dynamic Font Text is not enabled, Plaintiff has to scroll horizontally, making the content also inaccessible.

11.     Plaintiff brings this civil rights action against Amtrak to enforce Title II of the ADA and the Rehabilitation Act, which require, among other things, that public accommodations that receive Federal financial assistance (1) not deny persons with disabilities the benefits of their services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with Dynamic Font Text—where necessary to ensure effective communication with individuals with a visual impairment, and to ensure that such persons are not excluded, denied services, segregated, or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to the goods, content, and services available on Amtrak's Websites and Apps.

12.     By failing to make its Websites and Apps readable and/or usable when Dynamic Font Text is enabled, Amtrak, a public entity subject to Title II and a program or activity receiving Federal financial assistance, deprives individuals who are partially sighted or visually impaired the benefits of the goods, content, and services available in Amtrak's Websites and Apps —all benefits that Amtrak affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title II and the Rehabilitation Act were meant to redress.

13.     Because Amtrak's Website and Apps are not accessible, and because, upon information and belief, Amtrak does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Websites and Apps to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring that:

a.     Amtrak make available to individuals with disabilities adequate information

concerning transportation services. This obligation includes making adequate communications capacity available, through accessible formats and technology, to enable users to obtain information and schedule service.

b.      Amtrak operate a fixed route or demand responsive system that shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities.

c.      Amtrak maintain in operative condition those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with visual impairments.

d.      Amtrak repair promptly the Websites & App to make them accessible and in order.

e.      Amtrak develop and implement non-discriminatory policies and procedures to ensure:

     i.      that communications with individuals who have visual impairments are as effective as communications with others;

     ii.      that appropriate auxiliary aids and services are provided where necessary to afford an individual who is visually impaired an equal opportunity to enjoy the benefits of Amtrak's services, programs, and activities;

     iii.      that individuals who are visually impaired are informed of the availability of auxiliary aids and services during interactions with Amtrak, including while traveling; and,

     iv.      that individuals whose requests for effective communication are not

adequately addressed have the ability to grieve and obtain an adequate resolution of their grievance.

f.     Amtrak revise and/or update Amtrak's training and supervision programs to educate officers and employees about their obligation to:

i.     ensure that communications with individuals who have a visual impairment are as effective as communications with others;

ii.    provide individuals who are visually impaired appropriate auxiliary aids and services where necessary to afford them equal opportunity to enjoy the benefits of Defendant's services, programs, and activities;

iii.   inform individuals who are visually impaired of the availability of auxiliary aids and services while traveling; and,

iv.    such training should also include training for Defendant's personnel regarding Websites & App development.

g.     Amtrak retain a qualified consultant acceptable to Plaintiff ("Approved Accessibility Consultant") who shall assist it in improving the accessibility of its Websites and Apps, including all third party content and plug-ins, so the goods, content, and services on the Websites and Apps may be equally accessed and enjoyed by individuals with vision-related disabilities;

h.     Amtrak work with the Approved Accessibility Consultant to ensure that all employees involved in website and app development be given accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

i.     Amtrak work with the Approved Accessibility Consultant to perform an automated accessibility audit on a monthly basis to evaluate whether Amtrak's Websites and Apps may be

equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

j.      Amtrak work with the Approved Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are legally blind, or who have training and experience in the manner in which persons who are legally blind who use dynamic font to navigate, browse, and conduct business on Amtrak's Websites and Apps, in addition to the testing that is performed using semi-automated tools;

k.      Amtrak incorporate all of the Approved Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

l.      Amtrak work with the Approved Accessibility Consultant to create an Accessibility Policy that will appear as the first piece of content viewable with Dynamic Font on its Websites and Apps, along with an e-mail address, instant messenger, and toll free phone number to report accessibility-related problems;

m.      Amtrak reference its purportedly accessible website on the main website's page regarding travelers with disabilities, *e.g.*, https://www.amtrak.com/accessible-travel-services.

n.      Amtrak includes in the Accessibility Policy a statement that indicates that Amtrak is making efforts to maintain and increase the accessibility of its Websites and Apps to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of Amtrak through the Websites and Apps;

o.      Amtrak accompany the Accessibility Policy with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy;

p.      Amtrak includes in the Accessibility Policy a notice soliciting feedback from visitors to the Websites and Apps on how the accessibility of the Websites and Apps can be

improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy and information related thereto;

       q.      Amtrak provide a copy of the Accessibility Policy to all web and app content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Websites and Apps;

       r.      Amtrak train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Websites and Apps. Amtrak shall have trained no fewer than three (3) of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Amtrak shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public in the Accessibility Policy that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

       s.      Amtrak modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Websites and Apps to be inaccessible to the visually impaired as defined herein;

       t.      Plaintiff, Plaintiff's Counsel, and Plaintiff's experts monitor the Websites and Apps for up to two (2) years after the Approved Accessibility Consultant validates the Websites and Apps are free of accessibility errors/violations to ensure Amtrak has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through her Counsel and experts, shall be entitled to consult with the Approved Accessibility Consultant at her discretion, and to review any written material exchanged between it and Amtrak, including but not limited to any recommendations the Approved Accessibility Consultant provides Amtrak.

14.     Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. Jonathan Lazur et al., *Ensuring Digital Accessibility Through Process and Policy*, 140 (2015). As one leading commentator notes,

> The most significant problem is maintaining the accessibility of a large commercial site. Without policies, procedures and metrics—such as testing a release for accessibility before posting to the website and training in accessible design (so that accessibility is part of the design process the way, say, cybersecurity is)—the site's status as accessible will be temporary at best.

*Fighting for Accessible Websites under the ADA: Daniel Goldstein, Brown Goldstein Levy, Baltimore*, Bloomberg BNA, Jan. 13, 2016, ISSN 1098-5190 (reproduced with permission from Electronic Commerce & Law Report, 21 ECLR, 2, 1/13/16 (available at https://www.browngold.com/fighting-accessible-websites-ada) (last accessed September 24, 2019).

15.     To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

> [I]f you have planned to redesign or add a certain segment to your site, then make it accessible from the start. It's far cheaper to plan for an elevator than to decide to add one once your 30-story building is complete. Or if you are re-branding, consider using templates that will ensure accessibility. Make sure you have policies, procedures and metrics in place so that you know if you are maintaining accessibility and can identify why, if you are not. Most of all, consult disabled consumers or a consumer organization before deciding what you are going to do, and have consumers actually test the changes.

Something you imagine you may need to do, you may not need to do at all or may be able to do much cheaper. Something you hadn't thought to do may be critical to accessibility. And, of course, if you work with the disability community, they will spread the word that this is no longer a site to be avoided, but to be used.

*Id*. at 3.

## JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 as Plaintiff's claims arise under Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131 and 12161, *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*, and 28 U.S.C. § 1332.

17.    Venue is proper in this district under 28 U.S.C. §1391(b)(1) and (2) because Defendant resides in this District, Amtrak is subject to personal jurisdiction in this District, and a substantial portion of the conduct complained of herein occurred in this District.

18.    Amtrak is subject to personal jurisdiction in this District. Amtrak has been and is committing the acts or omissions alleged herein in the District of Columbia that caused injury and violated rights the ADA and/or Rehabilitation Act prescribes to Plaintiff and to other visually impaired consumers. A substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District: on separate occasions, Plaintiff Slaughter has been denied the full use and enjoyment of the facilities, goods, and services of Amtrak's Websites and Apps. The access barriers that Plaintiff encountered have caused a denial of Plaintiff's full and equal access in the past, and now deter Plaintiff on a regular basis from fully and equally enjoying the Websites and Apps, as well as Amtrak's physical facilities related thereto.

19.    This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

20.    Plaintiff Slaughter is, and at all relevant times hereto, a citizen of the state of

Illinois. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 C.F.R. §§ 37, *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794 *et seq.* and its implementing regulations. Plaintiff Slaughter's is prevented from accessing Amtrak's Websites and Apps' content and communications because Amtrak's Website and App are not accessible when her iPhone's Dynamic Font settings are used.  The Amtrak Websites and App are otherwise inaccessible to Plaintiff.

21.     Defendant Amtrak is and was, at all relevant times herein a Washington D.C. corporation with its principal executive offices at 1 Massachusetts Avenue, NW, Washington D.C., 20001.

## FACTS APPLICABLE TO ALL CLAIMS

### AMTRAK'S SERVICES

22.     Amtrak is a passenger railroad service that provides medium- and long-distance intercity service in the contiguous United States, serving more than 500 destinations in 46 states and operating more than 300 trains daily over 21,400 miles of track.

23.     Amtrak's Websites allow consumers to research and purchase these services from anywhere.

24.     Amtrak's Apps allow consumers to "access to all the travel information you need, whenever you need it."   *See*, Apple, App Store Preview, Amtrak, available at https://itunes.apple.com/us/app/amtrak/id405074003 (last accessed September 24, 2019).

25.     The Websites and Apps also enable consumers to book online deals and promotions, find schedules, locate stations, take advantage of Amtrak's Guest Rewards program, check train status, and more.

26.      In particular, Amtrak markets its iOS mobile application as follows:

Discover the convenience of traveling with Amtrak. With the Amtrak app you can get simple and intuitive access to all the travel information you need, whenever you need it.

- Show your eTicket while onboard, including multi-ride and monthly passes - no need to print
- Purchase one-way, roundtrip, multi-ride and monthly tickets
- Check train status
- Search for station information
- Send your eTicket to Apple Wallet
- And so much more...

With the Amtrak app, you can do it all right from your smart device.



*Figure 1 – Screenshots of Amtrak iOS App*

*See,*      Apple,      App      Store      Preview,      Amtrak,      available      at
https://itunes.apple.com/us/app/amtrak/id405074003 (last accessed September 24, 2019).

27.      According to Amtrak's website, several of the Apps features are accessible without

a network connection:

Can I use this app without a network connection?

If you lose connection, you will not be able to complete transactions, but will still be able to see upcoming reservations, access your eTicket, and view other important

information.  In order to maintain the most accurate information and access all functionality, a cellular or WiFi network connection is required.

*See* https://www.amtrak.com/mobile (last accessed September 24, 2019).

28.     In the Top 10 Frequently Asked Questions, Amtrak provides:

How can I check the status of my train?

Use the free Amtrak mobile app for iPhone® and Android® for a fast and easy way to check train status while you're on the go. You can also check train status on Amtrak.com by clicking the 'Train Status' button in the site header.

The Track a Train map is another powerful, interactive tool that shows you on a map where your train is and when it's expected to arrive at your destination.

*See*   https://www.amtrak.com/contact-us/top-10-faq-questions.html   (last accessed September 24, 2019).

**AMTRAK DENIES PLAINTIFF AND THE CLASS**
**FULL AND EQUAL ACCESS TO ITS SERVICES**

29.     Through her attempts to use the Websites and/or Apps, Plaintiff has actual knowledge of the access barriers that make Amtrak's services inaccessible to consumers with visual impairments and who use auxiliary aids such as Dynamic Font to access the goods, services, communications, and content available on Amtrak's Websites and Apps.

30.     Plaintiff Slaughter is a visually-impaired and legally blind person who cannot use a smart phone without the assistance of the iPhone accessibility setting known as Larger Dynamic Type. Large Dynamic Type is an Accessibility feature that helps increase legibility by using the iOS dynamic type engine to make fonts bigger and/or heavier and generally easier to read. For people with low vision, making text larger can magnify words without also magnifying interface elements.

31.     Prior to October 24, 2017, Plaintiff Slaughter consistently used Amtrak's iOS

mobile app to, among other things, check train status, schedules, estimated arrival times, and more without issue: Amtrak's iOS mobile application was compatible with her iPhone's Larger Dynamic Type Accessibility settings. However, on or about October 29, 2017, Plaintiff Slaughter attempted to use Amtrak's iOS mobile application and it appeared that it had been updated in a manner that caused content to become truncated and which did not enable users to be able to scroll vertically or horizontally to access the truncated content, rendering Defendant's services inaccessible.

32.     In fact, according to the iPhone Amtrak Mobile Application Version History, Amtrak launched a completely redesigned iOS mobile app on or about October, 24 2017:

3.0.1          Oct 24, 2017

A completely new design and experience.

We listened to you and redesigned our app to make it easier, faster and smarter to book and manage all your Amtrak travel. You'll get the same great services, plus some added features like a personalized home screen with convenient reservation cards that give you one-tap access to your eTicket and train status.

This is such a big update we have to make you login again.

*See*,        Apple,        App        Store        Preview,        Amtrak,        available        at https://itunes.apple.com/us/app/amtrak/id405074003 (last accessed September 24, 2019) and click on "Version History".

33.     While attempting to navigate Amtrak's redesigned iOS mobile app, Plaintiff Slaughter encountered multiple accessibility barriers for blind or visually-impaired people.

34.     In particular, with the new Amtrak iOS mobile app, all the large texts overlay each other/itself and it becomes impossible to read or see the app's content properly. Some functions are pushed off the screen entirely when Plaintiff Slaughter activates the Larger Dynamic Type feature.  For example, below are screen shots illustrating what Plaintiff Slaughter now views when she attempts to check a Train Schedule on Amtrak's new iOS mobile app when using the Larger Dynamic Type Accessibility Setting:



*Figure 2 – Screenshots of Amtrak iOS App with Larger Dynamic Type Accessibility Setting*

35.     Of importance, the letters get bigger, but there is no way to access the information that falls outside the frame of the screen when Plaintiff Slaughter activates the Larger Dynamic Type Accessibility Setting. As a result, Plaintiff Slaughter cannot access the scheduled departure time, estimated or actual departure times, the scheduled arrival time or the estimated or actual arrival times of trains, which information is freely available to travelers and their friends and families who do not use auxiliary aids to access the mobile application content and which information is illustrated here:



*Figure 3 – Screenshot of Amtrak iOS App without Accessibility Settings*

36.     After notifying Amtrak's agents of the accessibility issues that Amtrak's October 24, 2017 iOS update caused, Amtrak directed Plaintiff Slaughter to submit a complaint. As directed, Plaintiff Slaughter submitted a complaint to Amtrak on October 30, 2017.

37.     In fact, within two weeks of Plaintiff's Counsel reaching out to Amtrak's General Counsel regarding inaccessibility of the App, Amtrak, instead of updating the App to be viewable by individuals with visual impairment, updated the App to allow "booking trips for passengers with disabilities", which purportedly allows a third party to book travel for passengers with disabilities. Having to rely on someone else is not Plaintiff's preferred auxiliary aid or service. And, also, it doesn't help passengers with disabilities traveling alone, such as Plaintiff, to access all the travel information she needs, whenever she needs it (such as checking train status).

38.     Plaintiff Slaughter still attempts to access Amtrak's iOS mobile application, including within the last year. Unfortunately, to date, Amtrak has not made its App accessible to consumers who rely on Larger Dynamic Type to access online and/or mobile application content. To this end, Amtrak's App has undergone almost twenty updates since Plaintiff Slaughter submitted her accommodation request. Upon information and belief, none of these updates have

made the App adequately accessible to users with vision impairments.

39.     Plaintiff Slaughter is also unable to use her phone to access content available on the Websites, because of Amtrak's failure to build its Websites in a manner that is with the Dynamic Font.

40.     In order for Plaintiff to be able to read the content, she requires the maximum size of 10.

41.     For example, the purportedly accessible website is not really accessible to those who use the larger versions of Amtrak's Dynamic Font on their iPhone (6 clicks of Large from the Default Setting or above with a maximum size available of 10). Utilizing the Dynamic Font actually takes away the functionality of the mobile website. In particular, when 6-10 Dynamic Font is enabled, the drop-down box disappears. The drop-down box would otherwise enable passengers to access the following content: Buy Tickets, Destinations, Experience, Deals, Schedules, Amtrak Guest Rewards, Train Status, Modify Trip, Search Stations, Services Alerts, and Contact Us.

42.     Running a search in the search box for that information is not an option either, as the purportedly accessible mobile version of the Amtrak website does not have a search bar – or at least one that Plaintiff or Plaintiff's Counsel could find.

43.     As a consequence, individuals with disabilities who increase the Dynamic Font size font 6 times or more do not actually have access to those Amtrak webpages unless they know the exact web address of the corresponding assistive webpage, since there is no drop-down box. And if the Font is set at default or is increased by 5 times or less, Plaintiff and other visually impaired individuals cannot see it.

44.     Even if the drop down box were available and Plaintiff were able to access Train Status when the font was used (by reducing the web-based dynamic font, making it inaccessible

to the visually impaired, and then clicking on Train Status, and then increasing the web-based dynamic font to make it a size that is readable to the visually impaired), once one enters the information on the Train's Status page and submits the request, the status itself is not in Larger Dynamic Font.

45.     The regular mobile website is not accessible to persons with visual disabilities either, as when Dynamic Font is enabled on Plaintiff's iPhone, it requires the reader to scroll back and forth from left to right showing a few words at a time only, which is not adequate.  If Dynamic Font through her iPhone is not enabled, it is still difficult, as she has to enlarge the font by pinching the top of the screen and is only able to see a few words on the screen at a time and has the same issues as there is when Dynamic Font through her iPhone is enabled.

46.     As a result, Plaintiff is unable to understand, and thus is denied the benefit of, much of the content and services she wishes to access on the Websites and Apps.

47.     Unfortunately, as a result of visiting Amtrak's Websites and Apps, and from investigations performed on her behalf, Plaintiff has found Amtrak's Websites and Apps to be largely unusable due to various barriers that deny her full and equal access to Amtrak's online and/or mobile application content and services.

48.     The aforementioned barriers, and others, deny Plaintiff full and equal access to all of the services the Websites and Apps offer, as well as the physical locations, and now deters her from attempting to use the Websites and Apps. Still, Plaintiff would like to, and intends to, attempt to access the Websites and Apps in the future to research the services the Websites and Apps offer, or to test the Websites and Apps for compliance with the ADA and Rehabilitation Act.

49.     If the Websites and Apps were accessible, *i.e.* if Amtrak removed the access barriers described above, Plaintiff could independently research train status, view the same content

sighted individuals are able to use, and/or book Amtrak's services.

50.     Though Amtrak may have centralized policies regarding the maintenance and operation of its Websites and Apps, Amtrak has never had a plan or policy that is reasonably calculated to make its Websites and Apps fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are likely to persist.

51.     The law requires that Amtrak reasonably accommodate Plaintiff's disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense. To this end, Amtrak has, upon information and belief, invested substantial sums in developing and maintaining its Websites and Apps and has generated significant revenue from these online and mobile application services. These amounts are far greater than the associated cost of making the Websites and Apps equally and fully accessible to consumers with visual impairments.

52.     Plaintiff has been, and in the absence of an injunction will continue to be, injured by Amtrak's failure to provide its online and/or mobile application content and services in a manner that usable by individuals with visual impairments.

**AMTRAK'S DISCRIMINATION IS INTENTIONAL OR RECKLESS**

53.     Amtrak has long known that auxiliary aids are necessary for individuals with visual disabilities to access its online and/or mobile application content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

54.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the

Department's enforcement of it, has changed this interpretation.

55.     More recently, the United States Court of Appeals for the Ninth Circuit confirmed the ADA applies to websites and mobile applications, equally. *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019).

56.     Were Amtrak unaware of these auxiliary aids previously, Plaintiff Slaughter put Amtrak on notice when she submitted a complaint to Amtrak on or about October 30, 2017. However, notwithstanding Plaintiff Slaughter's request for an accommodation, nothing in Amtrak's iOS mobile application Version History indicates that Amtrak has resolved a single access barrier in the nearly twenty-two (22) months and eighteen (18) updates since October 24, 2017.

57.     Against this backdrop, and because adopting an adequate online and mobile application accessibility policy would provide Plaintiff and other visually-impaired consumers with equal access to the Websites and Apps, Plaintiff alleges that Amtrak has engaged in acts of intentional discrimination, including, but not limited to, the following policies or practices:

        a.      Constructing, updating, and/or maintaining its Websites and Apps so they are inaccessible to individuals with a visual impairment, including Plaintiff; and

        b.      Failing to take actions to correct these access barriers in the face of substantial harm and discrimination to blind and visually-impaired consumers, such as Plaintiff, as members of a protected class.

58.     Amtrak therefore uses standards, criteria or methods of administration that have the effect of discriminating or perpetuating the discrimination of others, as alleged herein.

**THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE**

59.     There is no DOJ administrative proceeding that could provide Plaintiff with the

injunctive relief she seeks.

60.     While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiff with relief.

61.     Plaintiff alleges violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

62.     Resolution of Plaintiff's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Amtrak offers content and services on its Websites and Apps, and (b) whether Plaintiff can access the content and services on the Websites and/or Apps.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff, individually and on behalf of herself and all others similarly situated, seeks to certify a nationwide class under Fed. R. Civ. P. 23(a) and 23(b)(2):

> All legally blind individuals in the United States who have attempted to access Defendant's Websites and/or Apps during the relevant statutory period and as a result have been denied access to the equal enjoyment of the goods and services the Websites and/or Apps offer.

64.     Excluded from the class is Amtrak, as well as its past and present officers, employees, agents or affiliates, and any judge who presides over this action.

65.     Plaintiff reserves the right to expand, limit, modify or amend the class definitions, including the addition of one or more subclasses, in connection with her motion for class certification, or at any other time, based on, among other things, changing circumstances and new facts obtained.

66.     **Numerosity.  Fed. R. Civ. P. 23(a)(1).** While Plaintiff does not know the exact

number of class members, Plaintiff believes there are hundreds, if not thousands of members in the Class. For example, during FY 2017 alone (October 2016 - September 2017), "Amtrak customers took 31.7 million trips, another record year. On an average day, customers make nearly 87,000 trips on more than 300 Amtrak trains."[4]  At least 2.4% of adults in the United States report to have a visual disability.[5] To this end, the class described above is so numerous that joinder of all members is impracticable. The disposition of the individual claims of the respective class members will benefit the parties and the Court and will facilitate judicial economy.

67.     **Commonality and Predominance.  Fed. R. Civ. P. 23(a)(2) and (b)(3)**. There is a well-defined community of interest among the members of the proposed Class in that there are several questions of law and fact common to the claims of Plaintiff and Members of the Class. All of the Members of the Class' claims are based upon the same facts and circumstances. Fed. R. Civ. P. 23(a)(3). The questions of law and fact common to the members of the Class predominate over any questions affecting only individual Members of the Class.  The resolution of common questions in this case will resolve the claims of both Plaintiff and the Class.  Common questions include, but are not limited to, the following:

a.      Whether Amtrak's Websites and Apps are a "public accommodation" or are services of a public accommodation such that Amtrak must guarantee Plaintiff full and equal access under the ADA;

b.      Whether Amtrak receives federal financial assistance or is a program or activity conducted by any Executive agency;

---

[4]      *See* Amtrak, Amtrak Facts, *available at* https://www.amtrak.com/national-facts (last accessed September 24, 2019).
[5]      *See* National Federation of the Blind, *Blindness Statistics*, *available at* https://nfb.org/resources/blindness-statistics (last accessed September 24, 2019).

c. Whether Amtrak's Websites and Apps are a "public accommodation" or are services of a public accommodation such that Amtrak must guarantee Plaintiff full and equal access under the Rehabilitation Act;

d. Whether Amtrak's Websites and Apps are compatible with auxiliary aids;

e. Whether Amtrak's Websites and Apps are fully compatible with Dynamic Type;

f. Whether it would be commercially unreasonable or an undue burden to require Amtrak to make its Websites and Apps compatible with auxiliary aids;

g. Whether it would be commercially unreasonable or an undue burden to require Amtrak to make its Apps compatible with Dynamic Type;

h. Whether making the Websites and/or Apps compatible with auxiliary aids and Dynamic Type would fundamentally alter Amtrak's goods, services, facilities, privileges, advantages, or accommodations offered;

i. Whether Plaintiff has been denied access the benefits of the services, programs, or activities of an Amtrak, or Plaintiff and the Class has been subject to discrimination by any such entity.

j. Whether Plaintiff and the Class has excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency.

k. Whether Plaintiff has been, and in the absence of an injunction, will continue to be injured by Amtrak's failure to provide the content and services available on its Websites and Apps in a manner that is compatible with Dynamic Type.

68. **Typicality. Fed. R. Civ. P. 23(a)(3).**  Plaintiff's claims are typical of the Class.

23

They are based on the same legal theories and arise from the same unlawful and willful conduct, resulting in the same injury to the Plaintiff and the respective Class.  Plaintiff and all members of the Class are similarly affected by Defendant's wrongful conduct and were damaged in the same way.  Specifically, members of the Class, like Plaintiff, are visually impaired, and claim that Amtrak violates the ADA and Rehabilitation Act by failing to update or remove access barriers on its Websites and Apps so that Amtrak's online and mobile application services can be independently accessible to the Class.

69.     **Adequacy.  Fed. R. Civ. P. 23(a)(4)**. Plaintiff is an adequate representative of the Class because Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.  Plaintiff falls within the class definition and Plaintiff's interests do not conflict with the interests of the Members of the Class Plaintiff seeks to represent. Plaintiff is passionate about this litigation personally and will prosecute this action vigorously for the benefit of the Members of the Class.  Plaintiff is represented by counsel who are competent and experienced in the prosecution of class action litigation, and Plaintiff's counsel intend to prosecute this action vigorously for the benefit of the Members of the Class.  Plaintiff and class counsel can fairly and adequately protect the interests of all of the Members of the Class.  Neither Plaintiff nor their counsel have any interest adverse to those of the other Members of the Class.

70.     **Superiority.  Fed. R. Civ. P. 23(b)(3)**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for

obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

71.     The litigation without the Class would allow litigation claims that, in view of the expense of the litigation, may be insufficient in amount to support separate actions.  Individual litigation of each Member of the Class' claims would be impracticable and individual litigation would be unduly burdensome to the courts.  Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Amtrak continues to engage in the discriminatory misconduct that is the subject of this Complaint. Absent a class action, most of the respective Members of the Class would find the cost of litigating their claims to be prohibitive, and will have no effective remedy.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

72.     **Injunctive and Declaratory Relief is Appropriate. Fed. R. Civ. P. 23(b)(1).**  The prosecution of separate actions by individual members of the Class would create a risk of:

a.     Inconsistent or varying adjudications with respect to individual members of the respective Class which would establish incompatible standards of conduct for Amtrak; and

b.     Adjudications with respect to individual members of the respective Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

73.     **Policies Generally Applicable to the Class.  Fed. R. Civ. P. 23(b)(2)**. Amtrak has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Amtrak's

practices challenged herein apply to and affect the members of the Class uniformly, and Plaintiff's challenge of those practices hinge on Amtrak's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

### FIRST CAUSE OF ACTION

### Discrimination Prohibited by the Americans With Disabilities Act
### Violation of 42 U.S.C. § 12132 *et seq.*, ("Title II: Part A"), and its implementing regulations

74.     Plaintiff, on behalf of herself and all others similarly situated, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

75.     Title II of the ADA, 42 U.S.C. § 12132 *et seq.* provides, in relevant part:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

76.     Defendant is a "public entity" within the meaning of 42 U.S.C. § 12131(1)(c) because Defendant is National Railroad Passenger Corporation.

77.     Plaintiff and putative class members are each a "qualified individual with a disability" as defined in 42 U.S.C. § 12102, because each has a visual impairment that substantially limits one or more of major life activities, including the major life activities of seeing, reading, and/or communicating.

78.     49 C.F.R. Part 37 "applies to the following entities, whether or not they receive Federal financial assistance from the Department of Transportation: (1) Any public entity that provides designated public transportation or intercity or commuter rail transportation" 49 C.F.R. § 37.21(a). For entities receiving Federal financial assistance from the Department of Transportation, compliance with applicable requirements of this part is a condition of compliance with section 504 of the Rehabilitation Act of 1973 and of receiving financial assistance.  49 C.F.R.

§ 37.21(b).

79.     DOT regulations prohibit public entities from "deny[ing] to any individual with a disability the opportunity to use the entity's transportation service for the general public, if the individual is capable of using that service." 49 C.F.R. § 37.5; *see also Ash v. Md. Transit Admin.*, Civil Action No. ELH-18-1216, 2019 U.S. Dist. LEXIS 39849, at *9 (D. Md. Mar. 12, 2019).

80.     49 C.F.R. § 37.167 (Other service requirements), which applies to public and private entities[6] mandates the following:

> The entity **shall** make available to individuals with disabilities **adequate information concerning transportation services**. This obligation includes making adequate communications capacity available, **through accessible formats and <u>technology,</u> to enable users <u>to obtain information</u> and schedule service.**

49 C.F.R. § 37.167(f) (emphasis added).

81.     Additionally, 49 C.F.R. § 37.173 mandates the following:

> Each public or private entity which operates a fixed route or demand responsive system **shall ensure that personnel are trained to proficiency, as appropriate to their duties**, **so that they** operate vehicles and equipment safely and **properly assist** and treat **individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities.**

(emphasis added).

82.  Furthermore, pursuant to 49 C.F.R. § 37.161(a):

> Public and private entities providing transportation services shall maintain in operative condition those <u>**features**</u> of facilities and vehicles that are <u>**required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities**</u>. <u>**These features include**</u>, but are not limited to, lifts and other means of access to vehicles, securement devices, elevators, signage and <u>**systems to facilitate communications with persons with impaired vision or hearing**</u>.

(emphasis added).

83. Additionally, 49 C.F.R. § 37.161(b) mandates:

---

[6] *See* 49 C.F.R. § 37.167(a)

**Accessibility features shall be repaired promptly if they are damaged or out of order**. When an accessibility feature is out of order, the entity shall take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature.

(emphasis added).

84.     Plaintiff's service and/or access interruptions to the Website & Apps are not due to isolated or temporary interruptions in service or access due to maintenance or repairs; but instead are due to updates that occurred several months ago.

85.     Defendant's actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations, including but not limited to 28 C.F.R. § 37.

86.     Plaintiff and the Class have been excluded from participation in and/or denied the benefits of Amtrak's Website & Apps and the information, content, goods, and services therein.

87.     Plaintiff and the Class Members have been denied full and equal access to Amtrak's services, goods, and benefits, including the Websites and Apps and the information, content, goods, and services therein.

88.     Furthermore, the Website & App barriers impede Plaintiff and the Class's ability to access Amtrak's physical locations, services, programs, and benefits.

89.     According to the ADA National Network, the goal of an auxiliary aid and service is "to ensure that communication with people with disabilities is as effective as communication with people without disabilities." *See* https://adata.org/factsheet/communication (last accessed September 24, 2019).

90.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

28

91.     Plaintiff uses an iPhone with enabled Dynamic Font as her auxiliary aid while travelling.

92.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

93.     By failing to provide its Websites and Apps' content and services in a manner that is compatible with auxiliary aids, Amtrak has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title II, including without limitation:

        a.      denying individuals with visual disabilities opportunities to participate in and benefit from the goods, benefits, content, and/or services available on its Websites and/or Apps;

        b.      affording individuals with visual disabilities access to its Websites and/or Apps that is not equal to, or effective as, that afforded others;

        c.      utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

        d.      denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others;

        e.      failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to

individuals with visual disabilities;

   f. failing to make available to individuals with disabilities adequate information concerning transportation services. This obligation includes making adequate communications capacity available, through accessible formats and technology, to enable users to obtain information and schedule service in violation of 49 C.F.R. § 37.167(f);

   g. failing to train personnel to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities in violation of 49 C.F.R. § 37.173;

   h. failing to maintain in operative condition those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities. These features include, but are not limited to, lifts and other means of access to vehicles, securement devices, elevators, signage and systems to facilitate communications with persons with impaired vision or hearing in violation of 49 C.F.R. § 37.161(a); and/or

   i. failing to repair the out of order accessibility features of the Website & Apps.

94. Defendant continued to discriminate against Plaintiff and the Class despite being notified on more than one occasion of Amtrak's accessibility issues.

95. In particular, Amtrak has violated Title II by, without limitation, failing to make its Websites and/or Apps' services accessible with Dynamic Type, thereby denying individuals with visual disabilities the benefits of the Websites and/or Apps, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

96.     Amtrak has further violated Title II by, without limitation, utilizing administrative methods, practices, and policies that allow its Websites and/or Apps to be made available without consideration of qualified individuals with visual impairments who access the company's Websites and Apps' goods, benefits, content, and/or services with Dynamic Font.

97.     Making its Websites and Apps' goods, content, and services compatible with Dynamic Font does not change the content of Amtrak's Websites and Apps nor result in making the Websites and/or Apps different, but enables individuals with visual disabilities to access the Websites and/or Apps Amtrak already provides.

98.     Amtrak's ongoing violations of Title II have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

99.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## SECOND CAUSE OF ACTION

**Discrimination Prohibited by the Americans With Disabilities Act**
**Violation of 42 U.S.C. § 12162 *et seq.*, ("Title II: Part B, Subtitle ii"), and its implementing regulations**

100.    Plaintiff, on behalf of herself and all others similarly situated, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

101.    Title II of the ADA, 42 U.S.C. § 12162(e)(1) *et seq*. provides, in relevant part:

It shall be considered discrimination for purposes of section 12132 of this title and section 794 of title 29 for a person to build a new station for use in intercity or commuter rail transportation that is not readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, as prescribed by the Secretary of Transportation in regulations issued under section 12164 of this title.

102.    Title II of the ADA, 42 U.S.C. § 12162(e)(2) *et seq.*, provides, in relevant part:

31

It shall be considered discrimination for purposes of section 12132 of this title and section 794 of title 29 for a responsible person to fail to make existing stations in the intercity rail transportation system, and existing key stations in commuter rail transportation systems, readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, as prescribed by the Secretary of Transportation in regulations issued under section 12164 of this title.

103.   All of Amtrak's stations in the intercity rail transportation system have not been made readily accessible to and usable by Plaintiff and the Class Members who are individuals with disabilities in violation of 42 U.S.C. § 12162(3)(2) *et seq.* and 49 C.F.R. Part 37.55.

104.   The Department of Transportation's ADA regulations reflect the ADA's broad nondiscrimination mandate. *See* 42 U.S.C. § 12164; *see also* 49 C.F.R. Part 37, which "applies to the following entities, whether or not they receive Federal financial assistance from the Department of Transportation: (1) Any public entity that provides designated public transportation or intercity or commuter rail transportation". 49 C.F.R. § 37.21(a).

105.   Pursuant to 49 C.F.R. § 37.21(b), "[f]or entities receiving Federal financial assistance from the Department of Transportation, compliance with applicable requirements of this part is a condition of compliance with section 504 of the Rehabilitation Act of 1973 and of receiving financial assistance."

106.   Pursuant to 49 C.F.R. § 37.21(c), "[e]ntities to which this part applies also may be subject to ADA regulations of the Department of Justice (28 C.F.R. Parts 35 or 36, as applicable). The provisions of this part shall be interpreted in a manner that will make them consistent with applicable Department of Justice regulations. In any case of apparent inconsistency, the provisions of this part shall prevail."

107.   Title II – A Regulation, 28 C.F.R. § 35.102, provides: (a) Except as provided in paragraph (b) of this section, this part applies to **all services, programs, and activities provided or made available by public entities**.

108.    Defendant is a "public entity" within the meaning of 42 U.S.C. § 12131(1)(c) because Defendant is National Railroad Passenger Corporation.

109.    Plaintiff and putative class members are each a "qualified individual with a disability" as defined in 42 U.SC. § 12102, because each has a visual impairment that substantially limits one or more of major life activities, including the major life activities of seeing, reading, and/or communicating.

110.    49 C.F.R. Part 37 "applies to the following entities, whether or not they receive Federal financial assistance from the Department of Transportation: (1) Any public entity that provides designated public transportation or intercity or commuter rail transportation" 49 C.F.R. § 37.21(a).  For entities receiving Federal financial assistance from the Department of Transportation, compliance with applicable requirements of this part is a condition of compliance with section 504 of the Rehabilitation Act of 1973 and of receiving financial assistance.  49 C.F.R. § 37.21(b).

111.    Defendant is a public entity that provides designated intercity rail transportation.

112.    DOT regulations prohibit public entities from "deny[ing] to any individual with a disability the opportunity to use the entity's transportation service for the general public, if the individual is capable of using that service." 49 C.F.R. § 37.5; *see also Ash v. Md. Transit Admin.*, Civil Action No. ELH-18-1216, 2019 U.S. Dist. LEXIS 39849, at *9 (D. Md. Mar. 12, 2019).

113.    49 C.F.R. § 37.167 (Other service requirements), which applies to public and private entities[7] mandates the following:

> The entity **shall** make available to individuals with disabilities **adequate information concerning transportation services**. This obligation includes making adequate communications capacity available, **through accessible formats and <u>technology</u>, to enable users <u>to obtain information</u> and schedule service.**

---

[7] *See* 49 C.F.R. § 37.167(a)

49 C.F.R. § 37.167(f) (emphasis added).

114.     Additionally, 49 C.F.R. § 37.173 mandates the following:

Each public or private entity which operates a fixed route or demand responsive system **shall ensure that personnel are trained to proficiency, as appropriate to their duties**, **so that they** operate vehicles and equipment safely and **properly assist** and treat **individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities.**

(emphasis added).

115.     Furthermore, pursuant to 49 C.F.R. § 37.161(a):

Public and private entities providing transportation services shall maintain in operative condition those **features** of facilities and vehicles that are **required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities**. **These features include**, but are not limited to, lifts and other means of access to vehicles, securement devices, elevators, signage and **systems to facilitate communications with persons with impaired vision or hearing**.

(emphasis added).

116.     Additionally, 49 C.F.R. § 37.161(b) mandates:

**Accessibility features shall be repaired promptly if they are damaged or out of order**. When an accessibility feature is out of order, the entity shall take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature.

(emphasis added).

117.     Plaintiff's and the class's service and/or access interruptions to the Website & Apps are not due to isolated or temporary interruptions in service or access due to maintenance or repairs; but instead are due to updates that occurred several months ago.

118.     Defendant's actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. 12162(e)(2), and its implementing regulations, including but not limited to 28 C.F.R. § 37.

119.    Plaintiff and the Class have been excluded from participation in and/or denied the benefits of Amtrak's Website & Apps and the information, content, goods, and services therein.

120.    Plaintiff and the Class Members have been denied full and equal access to Amtrak's services, goods, and benefits, including the Websites and Apps and the information, content, goods, and services therein.

121.    Furthermore, the Website & App barriers imped Plaintiff and the Class's ability to access Amtrak's physical locations, services, programs, and benefits.

122.    According to the ADA National Network, the goal of an auxiliary aid and service is "to ensure that communication with people with disabilities is as effective as communication with people without disabilities."  See https://adata.org/factsheet/communication (last accessed September 24, 2019).

123.    Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

124.    Plaintiff uses an iPhone with enabled Dynamic Font as her auxiliary aid while travelling.

125.    In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. § 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

126.    By failing to provide its Websites and Apps' content and services in a manner that

is compatible with auxiliary aids, Amtrak has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title II, including without limitation:

        a.      denying individuals with visual disabilities opportunities to participate in and benefit from the goods, benefits, content, and/or services available on its Websites and/or Apps;

        b.      affording individuals with visual disabilities access to its Websites and/or Apps that is not equal to, or effective as, that afforded others;

        c.      utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

        d.      denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others;

        e.      failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities;

        f.      failing to make available to individuals with disabilities adequate information concerning transportation services. This obligation includes making adequate communications capacity available, through accessible formats and technology, to enable users to obtain information and schedule service in violation of 49 C.F.R. § 37.167(f);

        g.      failing to train personnel to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the

difference among individuals with disabilities in violation of 49 C.F.R. § 37.173;

       h.     failing to maintain in operative condition those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities. These features include, but are not limited to, lifts and other means of access to vehicles, securement devices, elevators, signage and systems to facilitate communications with persons with impaired vision or hearing in violation of 49 C.F.R. § 37.161(a); and/or

       i.     failing to repair the out of order accessibility features of the Website & Apps.

127.    Defendant continued to discriminate against Plaintiff and the Class despite being notified on more than one occasion of Amtrak's accessibility issues.

128.    In particular, Amtrak has violated Title II by, without limitation, failing to make its Websites and/or Apps' services accessible with Dynamic Type, thereby denying individuals with visual disabilities the benefits of the Websites and/or Apps, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

129.    Amtrak has further violated Title II by, without limitation, utilizing administrative methods, practices, and policies that allow its Websites and/or Apps to be made available without consideration of qualified individuals with visual impairments who access the company's Websites and Apps' goods, benefits, content, and/or services with Dynamic Font.

130.    Making its Websites and Apps' goods, content, and services compatible with Dynamic Font does not change the content of Amtrak's Websites and Apps nor result in making the Websites and/or Apps different, but enables individuals with visual disabilities to access the Websites and/or Apps Amtrak already provides.

131. Amtrak's ongoing violations of Title II have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

132. Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

### THIRD CAUSE OF ACTION

### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973
### 29 U.S.C. § 794 *et seq.*

133. Plaintiff, individually and on behalf of all others similarly situated, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

134. Section 504 of the Rehabilitation Act of 1973 (as amended) provides that:

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]

29 U.S.C. § 794.

135. The statute defines an "individual with a disability" as "an individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (*citing* 42 U.S.C. § 12102).

136. "Otherwise qualified" means a person who "meets the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity." 28 C.F.R. § 39.103.

137. Plaintiff and putative class members are each a "qualified individual with a disability" as defined in the Act and implementing regulations, because each has a visual impairment that substantially limits one or more of their major life activities, including the major life activity of seeing, reading, and communicating; however would otherwise be capable of

participating in, or receiving benefits from, the goods, services, programs, and/or activities offered by Defendant.

138.    The named Plaintiff and the class members are individuals with disabilities within the meaning of the Rehabilitation Act because they have impairments which limit one or more major life activities (*i.e.*, seeing, reading, and communicating).

139.    Amtrak receives federal financial assistance to operate and provide transportation services.

140.    As a result of being qualified "individual[s] with a disability" within the meaning of the Act and the implementing regulations, Plaintiff and class members are entitled to reasonable accommodations in the form of auxiliary aids and services that provide them equal access to the Websites and Apps.

141.    As alleged herein, Amtrak has discriminated and continues to discriminate unlawfully against the named Plaintiff and class members by failing to ensure they have an opportunity to meaningfully access the services the Websites and Apps make available, including, by extension, Amtrak's intercity transportation services. By refusing or failing to create, maintain, operate, and/or update the Websites and Apps in a form that is accessible to blind or visually impaired individuals, Amtrak has created and continues to create a significant and unnecessary obstacle to Plaintiff's and the class members' use of the Websites and Apps and Amtrak's transportation services. Plaintiff and the class members cannot utilize the Websites and Apps in a manner full and equal to that of sighted persons. Plaintiff and the class members are forced to rely on the assistance of sighted persons to advise them of the information that can be found on the Websites and Apps. Such sighted assistance is often unavailable, unreliable, inconsistent, and untimely. Furthermore, relying on sighted assistance also requires individuals with visual

impairment to submit to an invasion of privacy; they must disclose travel plans to sighted persons simply to gain access to the information provided on the Websites and Apps. As a result, Plaintiff and class members who use sighted assistance are discriminated against.

142. Making the Websites and Apps accessible to Plaintiff and the class members would not fundamentally alter the Websites and Apps nor create an undue administrative or cost burden. Nor would making these digital technologies accessible to all fundamentally alter the transportation services Amtrak provides or create an undue administrative or cost burden related thereto. Numerous governmental agencies and large commercial entities—including the recipients of federal funding, who must comply with Section 504—already provide websites that are accessible to blind and visually impaired persons.

143. Amtrak's violations of Section 504 of the Rehabilitation Act have proximately caused injuries to Plaintiff, as set forth herein.

144. Amtrak's conduct constitutes an ongoing and continuous violation of the law.

145. Unless restrained from doing so, Amtrak will continue to so violate the law. Amtrak's conduct has caused and will continue to cause Plaintiff and the class members immediate and irreparable injury.

146. Plaintiff has no adequate remedy at law for the injuries they suffer and will continue to suffer.

147. Thus, Plaintiff and class members are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

### FOURTH CAUSE OF ACTION

**Declaratory Relief**
**28 U.S.C. §§ 2201 and 2202**

148. Plaintiff, individually and on behalf of all others similarly situated, repeats and

realleges every allegation of the preceding paragraphs as if fully set forth herein.

149.    An actual controversy has arisen and now exists between the parties in that Plaintiff contends, and is informed and believes that Amtrak denies, that Amtrak's Websites and Apps contain access barriers denying visually impaired legally blind customers the full and equal access to the goods, services and facilities of Amtrak's Websites and Apps, and by extension, its physical locations and intercity travel services, which Amtrak owns, operates and controls, and which it fails to comply with applicable laws including, but not limited to, Title II of the ADA and the Rehabilitation Act, prohibiting discrimination against the individuals with visual impairments.

150.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

151.    Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

(A)    A Declaratory Judgment that at the commencement of this action Amtrak was in violation of the specific requirements of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, *et seq*., 42 U.S.C. §§ 12161, *et seq*., and the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq*. described above, and the relevant implementing regulations of the ADA and Rehabilitation Act, in that Amtrak took no action that was reasonably calculated to ensure that its Websites and Apps are and/or remain fully accessible to, and independently usable by, individuals with visual disabilities;

(B)    A preliminary and permanent injunction pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*., and § 504 of the Rehabilitation Act of 1973,

as amended, 29 U.S.C. § 701 *et seq.*, as well as the regulations implementing the ADA and Rehabilitation Act which directs Amtrak to take all steps necessary to bring its Websites and Apps into full compliance with the requirements set forth in the ADA and Rehabilitation Act, and their respective implementing regulations, so that Amtrak's Websites & Apps services, and physical locations, are fully accessible to, and independently usable by, visually impaired, legally blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Amtrak has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully above in paragraph 13;

(C)     For an order certifying the proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as a class representative and appointing counsel for Plaintiff as lead counsel for the respective class;

(D)     Payment of actual, statutory, and other damages, as the Court deems proper;

(E)     Payment of costs of suit;

(F)     Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis, including costs of monitoring Amtrak's compliance with the judgment. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987) (*citing Northcross v. Board of Educ.*, 611 F.2d 624, 637 (6th Cir. 1979) ("Services devoted to reasonable monitoring of the court's decrees, both to ensure full compliance and to ensure that the plan is indeed working…are compensable services. They are essential to the long-term success of the plaintiff's suit."));

(G)     Whatever other relief the Court deems just, equitable and appropriate; and

(H)     An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

Dated:  September 27, 2019          By:    /s/ Jeffrey Kaliel                                 
                                    Jeffrey Kaliel (DC Bar No. 983578)
                                    Sophia Gold (DC Bar No. 1044723)
                                    **KALIEL, PLLC**
                                    1875 Connecticut Avenue NW, 10th Floor
                                    Washington, DC 20009
                                    Tele: (202) 350-4783
                                    Email: jkaliel@kalielpllc.com
                                    Email: sgold@kalielpllc.com

                                    R. Bruce Carlson (to seek admission *pro hac vice*)
                                    Todd Carpenter (to seek admission *pro hac vice*)
                                    Kevin W. Tucker (to seek admission *pro hac vice*)
                                    Bryan Fox (to seek admission *pro hac vice*)
                                    **CARLSON LYNCH LLP**
                                    1133 Penn Avenue, 5th Floor
                                    Pittsburgh, PA 15222
                                    Main: (412) 322-9243
                                    Direct: (412) 923-3947
                                    Fax: (412) 231-0246

                                    Tiffany M. Yiatras (to seek admission *pro hac vice*)
                                    **CONSUMER PROTECTION LEGAL, LLC**
                                    308 Hutchinson Road
                                    Ellisville, Missouri 63011-2029
                                    Tele: 314-541-0317
                                    Email: tiffany@consumerprotectionlegal.com

                                    **ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASS**