UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALYSON SLAUGHTER,** *et al.* ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> v. ) <br> ) <br> **NATIONAL RAILROAD PASSENGER** ) <br> **CORPORATION d/b/a AMTRAK,** ) <br> ) <br> **Defendant.** ) <br> ) | Case No. 19-cv-2920 (APM) |

## MEMORANDUM OPINION AND ORDER

### I.

Plaintiff Alyson Slaughter filed this putative class action against Defendant National Railroad Passenger Corporation ("Amtrak"), seeking to compel Amtrak to make its mobile website and mobile phone application accessible to individuals with visual impairments. Amtrak now moves to compel arbitration and dismiss the complaint, asserting that Plaintiff agreed to arbitrate their disputes when she consented to the Terms and Conditions of multiple purchased rail tickets. Plaintiff does not deny that she acceded to the arbitration clause contained in Amtrak's ticketing Terms and Conditions. Her position is that the parties never agreed to arbitrate the particular claims made in this lawsuit, which only concern the accessibility of Amtrak's mobile application and mobile website. These claims, she maintains, are governed by two other agreements—Amtrak's mobile application End User License Agreement and website Web Notices & Site Terms of Use. These agreements vest "exclusive jurisdiction" to settle disputes in "any Federal court located in the District of Columbia."

The court sides with Plaintiff. The parties did not consent to arbitrate disputes that arose out of Plaintiff's use of the mobile application and mobile website; instead, they agreed to resolve such disputes in a federal court in the District of Columbia, which is where Plaintiff filed her action. The court therefore denies Amtrak's Motion to Compel Arbitration and Dismiss the Complaint.

## II.

### A.

1.  *Amtrak's Mobile Application and Website Agreements*

Plaintiff Alyson Slaughter is visually impaired and must use an accessibility setting on her iPhone called Larger Dynamic Type. Compl., ECF No. 1, ¶ 30. Larger Dynamic Type is an operating feature that allows a user to magnify the text displayed on their device screen. *Id.* Prior to October 2017, Plaintiff consistently used Larger Dynamic Type to access and navigate Amtrak's iOS mobile application. *Id.* ¶ 31.

In late October 2017, Amtrak launched a redesigned iOS mobile application that presented "multiple accessibility barriers for blind or visually-impaired people." *Id.* ¶¶ 32–33. Specifically, enabling Larger Dynamic Type in the redesigned application made text impossible to read: some large text overlay each other, while other functions were pushed off the screen entirely. *Id.* ¶ 34. As a result, Plaintiff was unable to access train arrival and departure information, or other content that is available to Amtrak customers who do not require auxiliary aids to access Amtrak's mobile application content. *Id.* ¶ 35. Nor was Plaintiff able to access Amtrak's website on her mobile device. Enabling Larger Dynamic Type on the mobile version of the website removed the drop-down box that would allow her to access website content, including webpages for purchasing

tickets, checking train schedules and train statuses, modifying a trip, and contacting Amtrak. *Id.* ¶¶ 39–41.

Amtrak's mobile application is subject to an end user license agreement ("EULA"). Pl.'s Resp. in Opp'n to Def.'s Mot. to Compel Arbitration & Dismiss the Compl., ECF No. 9 [hereinafter Pl.'s Opp'n], at 6; Pl.'s Opp'n, Kaliel Decl., Ex. B, ECF No. 9-2 [hereinafter Ex. B]. By its terms, the EULA "is between [the user] and the National Railroad Passenger Corporation ('Amtrak') for [the user's] use of this Amtrak application." Ex. B at 10. It also "govern[s] any upgrades provided by Amtrak that replace and/or supplement the original Product, unless such upgrade is accompanied by a separate license or superseding license." *Id.* And, importantly for purposes of this case, the EULA requires the user to "submit to the exclusive jurisdiction of any Federal court located in the District of Columbia, United States of America, and waive any jurisdictional, venue or inconvenient forum objections to such courts." *Id.* at 12.

The EULA also provides that, by virtue of using the mobile application, a user is "required to accept and be subject to the Amtrak Terms of Use (including the Privacy Policy) found at www.amtrak.com." *Id.* at 10. These Web Notices & Site Terms of Use ("Website Agreement") "govern the relationship between Amtrak and [the user] with respect to [the user's] use of the Site." Pl.'s Opp'n, Kaliel Decl., Ex. A, ECF No. 9-2 [hereinafter Ex. A], at 2. Among other things, the Website Agreement binds users to Amtrak's Code of Conduct and outlines Amtrak's copyright and trademark protections. And, like the mobile application's EULA, the Website Agreement requires users "to submit to the exclusive jurisdiction of any Federal court located in the District of Columbia." *Id.* at 3–4, 5–6, 8. The Website Agreement also contains a merger clause: "This Agreement, including the Privacy Policy . . . is the entire agreement between us relating to the

3

subject matter herein and supersedes any and all prior or contemporaneous written or oral agreements between us with respect to such subject matter." *Id.* at 8.

### 2.  *Amtrak's Ticketing Terms & Conditions*

Notwithstanding Plaintiff's difficulties accessing Amtrak's mobile application and mobile website, Plaintiff purchased rail tickets on several occasions.  *See* Def.'s Mot. to Compel Arbitration & Dismiss the Compl., ECF No. 6, Tewari Decl., ECF No. 6-2 [hereinafter Tewari Decl.], ¶ 7.  To purchase a ticket, whether by website, mobile application, or mobile website, a customer must click a box affirming that they "have read and agree to the terms and conditions, including the binding arbitration agreement." *Id.* ¶¶ 5–6.  Plaintiff clicked the box at least nine times over four days, including on April 28, 2019, May 13, 2019, June 17, 2019, and June 23, 2019. *Id.* ¶ 7.

Amtrak's ticket Terms and Conditions ("Ticket Agreement") spans nearly twenty pages and covers various topics relating primarily to travel on Amtrak, including: Tickets and Passes, Baggage Information, Terms of Transportation, Accessible Travel Services, and Local Transportation.  *See generally* Tewari Decl., Ex. A, ECF No. 6-2 [hereinafter Ticket Agreement]. The Ticket Agreement also includes a force majeure clause, a disclaimer of liability, and, as relevant here, an arbitration provision. *Id.* at 19–20.  The arbitration agreement states:

> This Arbitration Agreement is intended to be as broad as legally permissible, and, except as it otherwise provides, applies to all claims, disputes, or controversies, past, present, or future, that otherwise would be resolved in a court of law or before a forum other than arbitration.

The arbitration agreement underscores its breadth by defining the types of claims subject to arbitration:

> Amtrak and Customer . . . AGREE that this Arbitration Agreement applies, without limitation, to claims Amtrak may have against You and claims You may have against Amtrak . . . based upon or related to: these Terms and Conditions, breach of contract, tort claims, common law claims, Your relationship with Amtrak, tickets, services and accommodations provided by Amtrak, carriage on Amtrak trains and equipment, any personal injuries . . . and any claims for discrimination and failure to accommodate, shall be decided by a single arbitrator through binding arbitration and not by a judge or jury.

*Id.* at 19. The arbitration agreement also includes a delegation clause, which provides that "the arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, unconscionability or waiver of this Arbitration Agreement." *Id*. Finally, the Ticket Agreement includes a class action waiver. *Id.* at 20.

**B.**

Plaintiff filed this lawsuit on September 27, 2019, alleging violations of the Americans with Disabilities Act and the Rehabilitation Act based on Amtrak's failure to make its mobile application and mobile website accessible to the visually impaired. Compl. ¶¶ 74–147. Plaintiff seeks declaratory and injunctive relief. *Id.* at 41–42.

Amtrak then moved to dismiss the case and compel arbitration. Def.'s Mot. to Compel Arbitration & Dismiss the Compl., ECF No. 6. Emphasizing the Federal Arbitration Act's liberal policy favoring arbitration, Amtrak argues that Plaintiff consented to the Ticket Agreement's arbitration clause each time she purchased a ticket, and that the broad terms of that clause cover this dispute because it reaches "all claims . . . past, present, or future . . . related to . . . any claims for discrimination and failure to accommodate." *See* Mem. of P. & A. in Supp. of Def.'s Mot. to Compel Arbitration & Dismiss the Compl., ECF No. 6-1 [hereinafter Def.'s Mot.], at 4, 13 (citing Ticket Agreement at 19). Moreover, Amtrak contends, the arbitration agreement's delegation

5

clause requires that an arbitrator and not this court decide any threshold question of arbitrability. *Id.* at 8–9.

Plaintiff, for her part, argues that the parties never agreed that the Ticket Agreement would govern *this* dispute; instead, the Website Agreement and the EULA, which include specific forum selection clauses and a merger clause, are controlling and reflect the parties' intent to resolve disputes arising from those agreements in any federal court in the District of Columbia. Pl.'s Opp'n at 1–2.  Alternatively, Plaintiff argues, the Ticket Agreement is illusory and unenforceable because it allows Amtrak to unilaterally modify any policy without notice. Pl.'s Opp'n at 2.  Because the court agrees that the parties never intended to arbitrate Plaintiff's claims, it does not reach Plaintiff's argument that the Ticket Agreement is illusory.

### III.

A.    **Motion to Compel Arbitration**

The Federal Arbitration Act ("FAA") "governs the enforcement of contractual arbitration provisions" in matters of interstate commerce, 9 U.S.C. § 1, *et seq.*, "as a means of securing prompt, economical and adequate solution of controversies," *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 479–80 (1989) (internal quotation marks and citation omitted).  "The FAA reflects 'a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" *Daniel v. eBay, Inc.*, 319 F. Supp. 3d 505, 510 (D.D.C. 2018) (quoting *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011)).  Accordingly, the FAA provides that "district courts *shall* direct the parties to proceed to arbitration on issues as to which

an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3–4).

When considering a motion to compel arbitration, courts apply the summary judgment standard of Federal Rule of Civil Procedure 56(c). *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[T]he party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made . . . [while] the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Sakyi v. Estée Lauder Cos.*, 308 F. Supp. 3d 366, 375 (D.D.C. 2018) (internal quotation marks omitted) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)). When deciding whether the parties agreed to arbitrate a dispute, courts apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

## IV.

Faced with three separate agreements between Plaintiff and Amtrak, the court must decide whether the parties intended for the claims at issue be governed by the Ticket Agreement—in which case they are subject to arbitration—or by the EULA and Website Agreement—in which case they are properly before this court.

Notwithstanding the liberal policy in favor of arbitration, *see Concepcion,* 563 U.S. at 339, arbitration remains a creature of contract. "[A]rbitration becomes mandatory only by mutual consent of the parties," and thus "there must be an agreement between them—interpreted and governed by normal principles of contract law—which provides for arbitration." *2200 M Street*

*LLC v. Mackell*, 940 A.2d 143, 150 (D.C. 2007) (citing *Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 165 (D.C. Cir. 1981)). Without a valid agreement to arbitrate, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* at 151 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). As the Supreme Court explained in *Granite Rock Co. v. International Brotherhood of Teamsters*, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." 561 U.S. 287, 297 (2010).[1]

When deciding whether parties have agreed to arbitrate a dispute, courts apply "ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944. Under District of Columbia law, a contract is formed when there is "both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *United House of Prayer for All People v. Therrien Waddell, Inc.*, 112 A.3d 330, 337–38 (D.C. 2015) (citation omitted). An "agreement as to material terms 'is most clearly evidenced by the terms of a signed written agreement.'" *Id.* at 338 (quoting *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 252 (D.C. 2005)). "The intention to be bound by the terms of an agreement 'can be found from written materials, oral expressions and the actions of the parties.'" *Mobile Now, Inc. v. Sprint Corp.*, 393 F. Supp. 3d 56, 64 (D.D.C. 2019) (quoting *Duffy v. Duffy*, 881 A.2d 630, 637 (D.C. 2005)).

Amtrak makes three principal arguments as to the arbitrability of this dispute: (1) any threshold questions of arbitrability must be decided by the arbitrator because the Ticket Agreement includes a delegation clause; (2) the plain language of the arbitration clause indicates that the

---

[1] *Granite Rock* concerned the preliminary question of agreement formation. *Id.* The Court rejected the contention that either the federal policy favoring arbitration or the presumption in favor of arbitrability could "override[] the principle that a court may submit to arbitration 'only those disputes . . . that the parties have agreed to submit.'" *Id.* at 301–02 (quoting *First Options*, 514 U.S. at 943); *see also Masurovsky v. Green*, 687 A.2d 198, 205 (D.C. 1996) (holding, under District of Columbia law, that "the presumption in favor of arbitration attaches only after the trial court has determined that a valid agreement to arbitrate exists").

parties intended this dispute to fall within its ambit; and (3) the claims in Plaintiff's lawsuit are fundamentally about travel, so she cannot argue that they fall solely under the Website Agreement or the EULA. The court addresses these arguments in turn.

### A.   The Delegation Clause

Ordinarily, in deciding whether to compel arbitration, courts are charged with determining two "gateway" issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. *Dean Witter*, 537 U.S. at 84. However, when the parties "clearly and unmistakably" agree to delegate the issue of arbitrability, the court must respect the parties' agreement. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (quoting *First Options*, 514 U.S. at 944). Relying on *Henry Schein*, Amtrak contends that the delegation clause in the Ticket Agreement constitutes clear and unmistakable evidence that the parties agreed to delegate gateway issues to an arbitrator. Def.'s Mot. at 8–9.

Amtrak's argument misses the mark. "A delegation clause is merely a specialized type of arbitration agreement." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019). The same principles of contract apply. Thus, a delegation clause is controlling "only where the court is satisfied that the parties agreed [to delegate gateway issues as to] *that dispute*." *Granite Rock*, 561 U.S. at 297. Here, the delegation clause provides that the parties intended to delegate gateway questions with respect to disputes that unmistakably arise under the Ticket Agreement. That clause does not, however, address the predicate question the court faces, which is whether the terms of the Ticket Agreement— or the EULA and Website Agreement—apply to the present dispute. The former contains a delegation clause; the latter two do not. Determining which agreement controls is a question for the court to resolve, not an arbitrator. *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 290 (E.D. Va. 2019) ("The Court's task is not to determine whether certain issues are arbitrable, but

whether a valid delegation provision exists."); *Portier v. NEO Tech. Sols.*, No. 3:17-cv-30111-TSH, 2019 WL 7945683, at *8 (D. Mass. Dec. 31, 2019) (holding that delegation clauses could not compel arbitration of gateway issues because the contracts containing the delegation clauses did not apply to the instant dispute).

*Henry Schein* is not to the contrary. *Henry Schein* concerned a judge-made "wholly groundless" exception to the gateway arbitrability decision that allowed courts to consider whether the issues in dispute were "subject to arbitration" even where the "contract delegate[d] the arbitrability question to an arbitrator." 139 S. Ct. at 528, 529. But as the Court in *Henry Schein* reaffirmed, "[t]o be sure, before referring a dispute to an arbitrator, *the court determines whether a valid arbitration agreement exists*." *Id.* at 530 (emphasis added) (citing 9 U.S.C. § 2). Accordingly, this court's task is to determine whether the parties agreed to arbitrate *this dispute*, and it is to that task that the court now turns.

### B.     The Arbitration Clause

By its terms, the Ticket Agreement's arbitration clause "applies to all claims, disputes, or controversies, past, present, or future, that otherwise would be resolved in a court of law or before a forum other than arbitration." Ticket Agreement at 19. Amtrak argues that the plain language of the arbitration clause evinces the parties' intent to subject this dispute—and indeed, nearly every conceivable dispute between Plaintiff and Amtrak—to the arbitration clause. The breadth of Amtrak's position was laid bare at the hearing on Amtrak's motion. *See* 4/1/2020 Draft Hr'g Tr. at 7–8. The court asked the following hypothetical: Say, Plaintiff and Amtrak had entered into a separate services contract that contained no arbitration provision. Would the arbitration clause in the Ticket Agreement force Plaintiff to arbitrate any dispute related to performance or payment

10

under the services contract?  *Id.*  Amtrak responded that the scope of the Ticket Agreement's arbitration provision would indeed sweep in disputes relating to the services contract.  *Id.*

Such an expansive reading of the Ticket Agreement's arbitration clause is untenable.  "No one can seriously argue that clauses can be plucked at random from one agreement and inserted into the other." *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 10 (1st Cir. 2004).  As one treatise observes:

> [M]ultiple instruments, even though executed between the same parties and at or about the same time, will not be construed together when they do not relate to the same matter and are not only independent of each other, but are either antagonistic to one another or otherwise cannot coexist or operate together.

11 SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 30:26 (4th ed. May 2020 update).  Another treatise describes the same principle in the context of arbitration clauses this way:

> One of several interrelated agreements may be silent as to arbitration while another may mandate arbitration.  When a claim arises under [ ] such a series of contracts, one must identify which contract applies.  If a court action could be maintained over a particular dispute (irrespective of another contract which requires arbitration), then that action falls outside the scope of the contract which requires arbitration.

1 THOMAS H. OEHMKE, COMMERCIAL ARBITRATION § 6:14 (May 2020 update) (footnote omitted).

Applying that principle here means that the instant dispute is not subject to arbitration.  Plaintiff's claims arise out of her "use" of Amtrak's mobile application and mobile website, which are governed by the EULA and the Website Agreement, respectively.  The EULA is a licensing agreement between the user and Amtrak "for [the user's] use of this Amtrak application."  Ex. B at 10.  The Website Agreement similarly provides that it "govern[s] the relationship between Amtrak and [the user] with respect to [the user's] use of the Site."  Ex. A at 2.  Neither of these agreements contain an agreement to arbitrate.  They instead contain forum selection provisions,

which the arbitration clause in the separate Ticket Agreement cannot supplant. To accept Amtrak's contrary position would mean that the Ticket Agreement's arbitration provision is tantamount to roving arbitration clause, filling in gaps where dispute-resolution provisions are absent and supplanting forum selection clauses that are present, notwithstanding the actual terms of the separate agreement. The parties cannot possibly have intended such a result.

The First Circuit's decision in *Fit Tech, Inc. v. Bally Total Fitness* supports the court's reading of the three agreements at issue in this case. In *Fit Tech*, the sellers of a business entered into an asset purchase agreement and an employment agreement with the buyer. 374 F.3d at 2–4. The employment agreement contained an arbitration clause with broad "relating to" language, but the asset purchase agreement contained no arbitration clause. *Id.* at 4, 9. When the sellers sued claiming violations of the asset purchase agreement, the buyer argued that the employment agreement's arbitration clause should govern, noting that there was an overlap between some of the issues to be arbitrated under the employment agreement and the claims raised in the district court lawsuit under the asset purchase agreement. *Id.* at 9–10. The First Circuit recognized that "[t]he two agreements do comprise understandings related to the same business sale and, in interpreting the documents, one provides context for the other." *Id*. at 10. However, it refused to order arbitration of the asset purchase agreement claims on the principal ground that the general arbitration clause, while broad, appeared only in the employment agreement and thus only governed disputes related to that agreement. *Id*. at 10–12. Likewise, here, the Ticket Agreement's arbitration provision, although broad, "deal[s] with different aspects of" Amtrak's provision of services to Plaintiff and cannot displace the intent *not* to arbitrate reflected in the EULA and the Website Agreement. *See id*. at 10; *see also Rosenblum v. Travelbyus.com Ltd*., 299 F.3d 657, 663–64 (7th Cir. 2002) (explaining that where "[t]he contracts are separate, and there is no indication

that the parties intended that the terms of the Employment Agreement apply to disputes arising under the Acquisition Agreement," the arbitration clause in the Employment Agreement would not apply to the Acquisition Agreement).

*Snyder v. Wells Fargo Bank, N.A.* lends further support for Plaintiff's position. No. 11 Civ. 4496 (SAS), 2011 WL 6382707 (S.D.N.Y. Dec. 19, 2011).[2] In *Snyder*, the individual plaintiff and Wells Fargo entered into two agreements—an investment management account agreement and a retirement account agreement, the latter of which included an arbitration clause. *Id.* at *2. The plaintiff sued Wells Fargo on various grounds related to the plaintiff's investment account, and Wells Fargo sought to compel arbitration based on the arbitration clause in the retirement account agreement. *Id.* at *3. Like here, the language of the arbitration agreement was broad, providing that "disputes between the parties to this agreement shall first be submitted to private binding arbitration." *Id.* at *4. The court explained, however, that "just because the [retirement account] agreement contains a broad arbitration clause, does not mean that [the plaintiff] can be forced to arbitrate claims arising out of a related but distinct contract." *Id.* The mere fact that multiple agreements exist "does not mean that arbitration clauses—or any other particularized clauses— can be lifted from one document and transferred to another." *Id.* at *5. Thus, while a plaintiff could be forced to arbitrate claims "however collateral [ ] that arise under a particular agreement," the general rule to enforce broad arbitration agreements could not compel arbitration of "claims arising from a distinct contract not providing for arbitration." *Id.* at *4. Here, as in *Snyder*, the omission of an arbitration clause in both the EULA and the Website Agreement suggests that the parties "*did not* agree to arbitrate disputes" arising under those two agreements. The omission of an arbitration clause from two contracts that likewise concern a consumer's use of Amtrak's

---

[2] That *Snyder* applied New York law is not a material difference.

products "strongly suggests that such omission was intentional." *Id.* at *5. Indeed, including an arbitration clause "would have been child's play." *Fit Tech*, 374 F.3d at 10.

Two other aspects of the EULA and the Website Agreement evince the parties' intent not to arbitrate disputes relating to those agreements. First, both agreements include their own forum selection clause, by which the parties consented to "the exclusive jurisdiction of any Federal court located in the District of Columbia." Ex. B at 12; Ex. A at 8. "The parties' consistent inclusion of forum selection clauses in the two agreements that did not contain an arbitration clause . . . thus suggests that the parties assumed that claims arising under these agreements would be heard in a court, not as part of an arbitration." *Rosen v. Mega Bloks Inc.*, No. 06 Civ. 3474 (LTS)(GWG), 2007 WL 1958968, at *6 (S.D.N.Y. July 6, 2007). Second, the Website Agreement contains a merger clause: "This Agreement . . . is the entire agreement between us relating to the subject matter herein and supersedes any and all prior or contemporaneous written or oral agreements between us with respect to such subject matter." Ex. A at 8. Such a clause "further evidences the intent of the parties not to require arbitration regarding disputes arising under" Plaintiff's use of Amtrak's website. *Snyder*, 2011 WL 6382707, at *5; *see also Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 127 (D.C. 1992) (While the "presence or absence of a merger clause indicating complete integration" is not by itself conclusive that the parties intended said agreement to be the complete agreement between them, it "may be a significant . . . factor in ascertaining the parties['] intent.").

Amtrak's main contention as to why the Ticket Agreement's arbitration clause supersedes the forum selection clauses in the EULA and the Website Agreement is timing. It points out that Plaintiff checked the box affirming the Ticket Agreement as late as January 10, 2019, while the Website Agreement is dated August 5, 2016, and the EULA is dated July 2011, *see* Def.'s Reply

at 18. Amtrak relies on the principle that a contract "containing a term inconsistent with a term of an earlier contract between the same parties regarding the same subject matter is interpreted to rescind the inconsistent term in the earlier contract." *Id.* (quoting *Nat'l R.R. Passenger Corp. v. ExpressTrak, LLC*, 330 F.3d 523, 530 (D.C. Cir. 2003)); *see also* 4/1/2020 Draft Hr'g Tr. at 15. But the rule of contract interpretation articulated in *ExpressTrak* is not applicable here. It applies only where two or more contracts "regard[ ] *the same subject matter*." *ExpressTrak*, 330 F.3d at 530 (quoting *Chang v. Louis & Alexander, Inc.*, 645 A.2d 1110, 1114 (D.C. 1994) (emphasis added)). The contracts here concern different subject matter. The Ticket Agreement concerns the terms of carriage, while the EULA and the Website Agreement address, respectively, the terms of use of Amtrak's mobile application and website. The last-in-time contract therefore does not control.

At bottom, the breadth of the Ticket Agreement's arbitration clause cannot overcome the foundational principle that an arbitration clause applies only to those matters to which the parties intended it would apply. *See Granite Rock*, 561 U.S. at 301–02. Because Plaintiff's claims arise from her use of the mobile application and mobile website, the EULA and the Website Agreement are the pertinent agreements and their forum selection clauses are controlling. The Ticket Agreement does not compel arbitration of this dispute.

        **C.**     **Plaintiff's claims do not relate to the Ticket Agreement.**

Lastly, Amtrak argues that, even if the court determines that the EULA and Website Agreement apply to Plaintiffs' claims, "the accommodations she seeks are specifically brought against Amtrak as a public transportation entity," and therefore the Ticket Agreement is necessarily implicated. Def.'s Reply at 16. In other words, Amtrak contends that Plaintiff's claims still relate to the Ticket Agreement and thus fall within its ambit.

In considering whether Plaintiff's claims "relate to" the Ticket Agreement, *Wachovia Bank, National Ass'n v. Schmidt*, a Fourth Circuit decision that considered the breadth of a "relating to" arbitration clause, is useful. 445 F.3d 762 (4th Cir. 2006). In *Wachovia*, the plaintiffs and defendants had "two distinct relationships": defendants advised plaintiffs to invest in a financial deal that ultimately soured, and defendants had loaned money to plaintiffs so that plaintiffs could invest in that financial deal. *Id*. at 768. While the lending contract had a broad arbitration clause, the investment deal document contained no arbitration clause. *Id*. at 765–67. The Fourth Circuit considered a number of factors in evaluating whether the allegations related to the contract containing the arbitration clause: (1) the fact that the claims derived from defendants' adviser-advisee relationship while the arbitration clause dealt with the defendants' lender-lendee relationship; (2) the fact that court resolution of the claims would "require no inquiry into the [lending relationships]'s terms, nor even knowledge of the [promissory note's] existence"; and (3) the fact that the financial deal and the lending transaction were not part of a "single, integrated course of dealing" because plaintiffs could have participated in the financial deal without taking out a loan from Wachovia. *Id.* at 768.

Applying *Wachovia*'s logic here, (1) Plaintiff's claims arise from her relationship with Amtrak as a mobile application user and mobile website user—not her relationship with Amtrak as a train passenger; (2) Plaintiff's claims require no inquiry into the terms of Plaintiff's carriage on Amtrak, nor even knowledge that a separate Ticket Agreement exists; and (3) Plaintiff's claims are not part of the same course of dealing as her ticket purchases because Plaintiff could have attempted to access the website and mobile application without ever purchasing an Amtrak ticket. That the various agreements are related—indeed, Plaintiff's use of the website and mobile

application facilitates her travel on Amtrak trains—does not permit otherwise distinct contracts to intermix their dispute resolution terms. *See Fit Tech*, 374 F.3d at 10; *Rosenblum*, 299 F.3d at 663.

V.

For the foregoing reasons, the court denies Amtrak's Motion to Compel Arbitration and Dismiss the Complaint, ECF No. 6.

Dated: May 18, 2020

Amit P. Mehta
United States District Judge